## OSBORN and others *against* PHELPS :

### IN ERROR.

If an agreement for the sale of land, by mistake, is not in accordance with the intention of the parties, a court of equity will not, by the aid of parol evidence, reform the agreement, and then decree the execution of it as reformed. [One judge dissenting.]

Therefore, where *A* and *B* entered into an agreement for the sale of land, and separate writings were drawn for the signature of each, *viz.* one for *A* as vendor, and the other for *B* as vendee; and by mistake, the former was signed by *B*, and the latter by *A ;* and by reason of such mistake, neither of these writings expressed correctly the intention of the parties, there being no reference in one to the other; on a bill in chancery brought by *B* against *A*, to have the mistake corrected, and a specific execution of the agreement, according to the intention of the parties, enforced ; it was held, that parol evidence was inadmissible to show the mistake, and the bill was dismissed. [One judge dissenting.]

But where the mistake is set up by way of defence against a claim for the specific execution of the agreement, parol evidence is admissible to establish such defence,

*Hartford,*
*June, 1848.*

Osborn
*v.*
Phelps.

An agreement was entered into between *A* and *B* for the sale of a parcel of land, at a certain sum, if *B* should put up his mill, (on other land,) and at a larger sum, if he should not. No part of the purchase money was paid. At the time of the agreement, the land in question was in the possession of *C*, under a lease from a former owner, having about seven months to run. *B*, however, took immediate possession, under his agreement with *A*, and continued such possession, for about seven months. *B* also erected his mill; but it did not appear whether he would, or would not, have erected it, if he had made no agreement with *A*. On a bill brought by *B* against *A*, for a specific execution of the agreement, it was held, that neither the possession by *B*, nor his erection of the mill, constituted a part performance, which would take the case out of the statute of frauds. [One judge dissenting.]

This was a bill in chancery, brought originally to the county court, by *Bethuel Phelps*, against *Hiram Osborn*, *Arnold Hamilton*, *William Abbe* and *Daniel B. Dorman*. The object of the bill was to procure the correction of a mistake in a contract for the sale of a certain tract of land, and a decree for the specific execution of the contract.

The material facts, as found by the county court, are substantially these. *Phelps*, the plaintiff in the suit, was the owner of a certain mill privilege, situated in the town of *East-Windsor*, upon which he was about to erect a mill. *Osborn*, one of the defendants, was the owner of a certain other tract of land, situated in the same town, containing about one third of an acre. And it being greatly for the interest, convenience and accommodation of *Phelps*, as the owner of the mill privilege, to be also the owner of the land belonging to *Osborn*, it was, on the 26th day of *August* 1844, mutually agreed between *Osborn* and *Phelps*, that *Osborn* should sell his land to *Phelps*, and in consideration that *Phelps* would put a mill upon his mill privilege, he should have the land for fifty dollars; but if the same contained more than one third of an acre, the price should be at the rate of one hundred and fifty dollars per acre; and in case *Phelps* should not erect his mill, he should pay *Osborn* fifty dollars more; the payment and conveyance to be made in a reasonable time. The parties thereupon executed and delivered written instruments of the following tenor:

*"Manchester, August 26th, 1844.*

I, this day, have contracted with Mr. *Osborn* for the piece of land, *South* of the tavern stand, recently bought by him of Mr. *Kinsley*, one third of an acre, (more or less,) at fifty

dollars; if more than one third of an acre, at the rate of one hundred and fifty dollars an acre, in consideration that the said *Phelps* puts up his mill; in case he does not, the said *Phelps* is to pay me fifty dollars more.                *Hiram Osborn.*"

"*Manchester*, *August 26th,* 1844.

I, this day, have contracted with *Bethuel Phelps* to let him have a piece of land *South* of the tavern stand, recently bought of Mr. *Kinsley,* one third of an acre, (more or less,) at fifty dollars; if more than a third of an acre, at the rate of one hundred and fifty dollars per acre, in consideration that the said *Phelps* puts up his mill; in case he does not, he is to pay me fifty dollars more.                *B. Phelps.*"

The writing executed by *Osborn,* was delivered to *Phelps,* and the other to *Osborn;* and they have ever since been held and retained by the parties respectively.   It was the intent and design of the parties that the writing executed by each of them should contain and specify that part of the contract which was to be by him performed; and being so executed, should be delivered to the other party.   But by mistake and accident, the writing executed by each of the parties, was incorrectly drawn.   It was intended that both instruments should express the whole contract, and they were executed and delivered at the same time, as parts of one transaction; and the mistakes in said writings arose from the accident that each party put his signature to the paper intended for the signature of the other.

At the time of the execution of the agreement, the land was in possession of *Elihu Hubbard,* under a lease from *Kinsley,* the former owner of the land, for the term of one year from the 1st day of *April* 1844.   Immediately after the agreement was made, and during the continuance of *Hubbard's* lease, *Phelps,* relying upon the faithful performance of the contract by *Osborn,* but without his express consent, took possession of the premises, under and by virtue of the contract, and retained possession thereof, for a period of seven months.   After the execution of the contract, *Phelps* proceeded to erect, and did erect, the mill.   But the court did not find, whether he would, or would not, have erected the mill, if no contract had been made for the purchase of the land from *Osborn.*

On the 18th day of *December, Osborn* conveyed the land

in question to *Hamilton* and *Abbe,* who afterwards, on the 16th day of *February* 1846, conveyed to *Dorman ;* and the several grantees, at the times when the conveyances were made to them, had knowledge of the facts aforesaid.

On the 1st day of *March* 1845, *Phelps* offered and tendered to *Osborn* a sum of money in a bag, which he represented and claimed amounted to the sum of sixty-five dollars, and demanded of him a deed of the premises; but *Osborn* refused to receive the money, and execute the deed, or to have any thing more to do with the contract, he having previously conveyed away the land to *Hamilton* and *Abbe.* Whether there was in fact sixty-five dollars in the bag, did not appear to the court.

On the 6th day of *December* 1845, *Phelps* offered and tendered to *Hamilton* and *Abbe* the sum of seventy-five dollars, being more than "at the rate of one hundred and fifty dollars per acre for the land, and demanded of them a deed of the same, with the usual covenants of seisin and warranty; which deed he presented to them for execution; but they neglected and refused to execute the same. And on the 16th day of *March* 1846, he offered and tendered to *Dorman,* a like sum, and demanded of him a like deed, which he also presented for execution; but *Dorman* neglected and refused to execute the same.

The quantity of land in the tract was found to be less than half an acre; and *Phelps* brought into court, and deposited with the clerk, for the party entitled to the same, the sum of seventy-five dollars.

*Osborn, Hamilton, Abbe* and *Dorman* were all made defendants in the suit.

On the trial of the cause, *Phelps* having introduced in evidence the writing set forth in the finding of the court, for the purpose of proving the mistake in the writings, offered witnesses to testify to a conversation with *Osborn* in relation to the contract. The defendants objected to their admission, on the ground that parol evidence was not admissible for such purpose; and that the agreement was within the statute of frauds and perjuries. But the court overruled the objection, and admitted the testimony.

The defendants thereupon filed a bill of exceptions, which was allowed by the court, and duly signed.

Upon the facts thus found, the court decreed, that the written instruments should be corrected, according to the intent of the parties, as found by the court; that the title to the premises should be transferred to, and vested in the plaintiff in fee-simple; that the clerk pay over to the defendants the seventy-five dollars, deposited with him; and that the plaintiff recover his costs.

The defendants thereupon brought their writ of error to the superior court, assigning various errors as a ground for the reversal claimed; and the case was reserved for the advice of this court.

*Hungerford*, for the plaintiffs in error, contended, 1. That no decree whatever could be passed against *Hamilton* and *Abbe*. No breach of duty on their part is alleged in the bill, other than that they respectively refused to give a warranty deed of the premises sought to be recovered; whereas they were under no obligation to give such deed. They ought not, therefore, to have been made parties. *Van Eps* v. *Schenectady*, 12 *Johns. R.* 436. *Ketchum* v. *Evertson*, 13 *Johns. R.* 359. *Fuller* v. *Hubbard*, 6 *Cowen*, 13.

2. That the payment and conveyance were to be made concurrently; and either, to enforce a performance, must show a readiness to perform on his part; which the plaintiff below did not do. *Kraus* v. *Arnold*, 7 *J. B. Moore*, 59. *Breed* v. *Hurd*, 6 *Pick.* 356. *Fuller* v. *Little*, 7 *N. Hamp.* 535.

3. That the bill alleges and the court finds, that the payment and conveyance were to be made within a reasonable time; but it is neither alleged nor found, that there was any offer or request of performance, by *Phelps*, within such reasonable time. There is, therefore, in the first place, no breach of contract or duty alleged in the bill or found by the court, in respect to either of the defendants. *Canfield* v. *Merrick*, 11 *Conn. R.* 425. *Newell* v. *Roberts*, 13 *Conn. R.* 417. *Dale* v. *Dean*, 16 *Conn. R.* 579. *Osborne* v. *Lawrence*, 9 *Wend.* 135. But secondly, it does appear affirmatively, that if there was any offer to perform by *Phelps*, it was after a reasonable time had elapsed and gone by. Thirdly, the writings, upon their face, appeared to be of no legal force; and *Hamilton*, *Abbe* and *Dorman* might well suppose *Phelps* claimed nothing under them.

*Hartford,*
*June, 1848.*

Osborn
*v.*
Phelps.

4. That the contract being one for the sale of lands, it could not be proved by parol evidence ; the statute of frauds requiring it to be in writing and signed by the party to be charged therewith. *Stat.* 299. *tit.* 39. *s.* 1. (ed. 1838.) And the attempt here made to reduce the contract to writing, does not help the case, so long as it was not done. *Clinan* v. *Cooke,* 1 *Scho. & Lef.* 22. *Woollam* v. *Hearn,* 7 *Ves.* 211. *Higginson* v. *Clowes,* 15 *Ves.* 516. *Westbrook* v. *Harbinson,* 2 *McCord's Ch. R.* 115. *Elder* v. *Elder,* 1 *Fairf.* 80.

5. That there was no such part performance as would take the case out of the statute. In the first place, the land itself was under a lease, and the possession beyond the controul of *Osborn ;* and as soon as the lease expired, *Osborn,* or those holding under him, immediately took and held the exclusive possession. Secondly, the contract, so far as set forth in the writings or alleged in the bill, was entirely executory ; and there was no agreement that *Phelps* should take possession until a deed was given and payment made. Of course, an immediate entry was no part performance. Thirdly, the erection of the mill was no part performance of the contract ; as the bill no where alleges it as such part performance ; and the court does not find whether it would, or would not, have been erected, but for such contract ; whereas the erection of the mill should be exclusively under the contract, to make it part performance. *Clinan* v. *Cooke,* 1 *Scho. & Lef.* 22. *Phillips* v. *Thompson,* 1 *Johns. Ch. R.* 131. 146. *Givens* v. *Calder,* 2 *Desaus.* 171. 2 *Sto. Eq. s.* 764. 767.

6. That the court ought, in making its decree, to have designated to which of the defendants, if to either, the purchase money should be paid.

*T. C. Perkins,* for the defendant in error, contended, 1. That the decree was not erroneous, because *Hamilton* and *Abbe* were made parties to the bill. In the first place, they were properly made parties ; *Hamilton* and *Abbe* having conveyed the land to *Dorman,* by deed of warranty. The general rule is, that all who have an interest in defending the title, as warrantors or vendors, must be made parties. *Findlay* & al. v. *Hinde* & ux. 1 *Pet.* 241. The bill charges fraud in taking and transferring title, with notice ; and *Dorman* would have the right to have *Hamilton* and *Abbe* brought be-

fore the court, that they might be *concluded*, on this point, by the decree. But secondly, this is not ground of error. *The New-London Bank* v. *Lee*, 11 *Conn. R.* 112. Thirdly, the objection comes too late : it should have been taken by plea or demurrer. *Watertown* v. *Cowen*, 4 *Paige*, 510.

2. That the decree was not erroneous, on the ground that there was no tender to *Osborn*, or to the other defendants' within a reasonable time, or except upon giving a deed with covenants. In the first place, as to the tender to *Osborn ;* his refusal to have any thing to do with the matter, was a waiver of a formal tender. *Sands* v. *Lyon*, 18 *Conn. R.* 18. 25. *Harding* v. *Davies*, 2 *Car. & Pa.* 77. (12 *E. C. L.* 35.) *Gilmore* v. *Holt*, 4 *Pick.* 258. *Barstow* v. *Gray*, 3 *Greenl.* 409. 417. Secondly, *Osborn* having incapacitated himself to perform, by conveying away the land, no tender was necessary. *Sto. Bail. s.* 349. *Cortelyou* v. *Lansing*, 2 *Caines Ca. in err.* 214. *Newcomb* v. *Brackett*, 16 *Mass. R.* 161. *Richards* v. *Allen*, 5 *Shep.* 296. Thirdly, a tender having been made to *Osborn*, (or what was equivalent,) and the others knowing all the facts, when they took their deeds, and being thus implicated in a *fraud, any* time, as to them, was a *reasonable* time. Having joined with *Osborn* in an attempt to defraud *Phelps*, they are not in a situation to exact extraordinary diligence from him; nor will they be permitted to set up any slight *laches* on his part. Fourthly, in point of fact, a tender was made and a deed demanded, within a reasonable time. Fifthly, the bill might have been sustained without a tender ; which was necessary only to carry costs— as on a bill to redeem mortgaged premises.

3. That *Phelps* was entitled to a warranty deed ; and it was the duty of the grantor to prepare and execute it. 2 *Chan. Dig.* 605, 6. *Taylor* v. *Longworth* & al. 14 *Pet.* 172. 175.

4. That all that was required of *Phelps*, even at law, and as against *Osborn*, was ability and readiness to perform on his part ; as the giving of a deed and payment of the purchase money, were mutual acts, to be performed at the same time, and neither party was bound to do the *first* act. *Hammond* v. *Gilmore's* admr. 14 *Conn. R.* 480. *Tinney* v. *Ashley*, 15 *Pick.* 546. The finding is, that *Phelps* has always been ready and willing.

5. That parol evidence was admissible to show the mistake. There is no doctrine in equity jurisprudence better settled than that a court of chancery will reform a written agreement so as to make it conformable to the intention of the parties; and that intention is to be made out, by parol evidence. *Washburn* v. *Merrills*, 1 *Day* 139. *Abbe* v. *Goodwin*, 7 *Conn. R.* 377. *Wheaton* v. *Wheaton*, 9 *Conn. R.* 99. *Annan* v. *Merritt*, 13 *Conn. R.* 491,2. 1 *Sto. Eq. s.* 153 to 161. inclusive. It would be, as remarked by Judge *Story*, a great defect in the moral jurisdiction of the court, if, under the circumstances of this case, it was incapable of administering relief. 1 *Sto. Eq.* 168. *s.* 156. The party aggrieved by the mistake, is entitled to have it corrected, whether he be plaintiff or defendant ; and when the agreement is set right, he may avail himself of it, as a ground of relief, or by way of defence, in the same manner as though the mistake had never existed. *Gillespie* & ux. v. *Moon*, 2 *Johns. Ch. R.* 585. 1 *Sto. Eq.* 175. *s.* 161. and note 1.

6. That if the statute of frauds is relied upon as a bar to the relief sought, here has been a part performance by *Phelps*, in the erection of the mill and possession of the land, which takes the case out of the statute.

7. That the decree is not erroneous, because it directs the purchase money to be paid to the defendants generally. The plaintiff was not bound to show which of them was entitled to the money.

WAITE, J. Our statute provides, " that no suit in law or equity shall be brought or maintained upon any contract for the sale of lands, unless the contract upon which the action shall be brought, or some note or memorandum thereof, shall be made *in writing*, and *signed* by the party to be charged therewith, or some other person, thereunto by him lawfully authorized." *Stat.* 299. *tit.* 39. *s.* 1. (ed. 1838.)

The original suit, in this case, was brought for the purpose of obtaining a decree for the specific execution of a contract for the sale of land. It was, therefore, incumbent upon the plaintiff to establish two facts—that the contract had been reduced to *writing*, and was *signed* by the party to be charged therewith, or his agent. If he fail to do this, the statute is imperative, that the suit cannot be maintained—at any rate,

without showing other facts which will relieve the case from the operation of the statute.

*Hartford*, June, 1848.

Osborn
*v.*
Phelps.

It is claimed, that the contract for the sale of the land, was made by *Osborn*, one of the defendants ; and the object is, to have it enforced as against him, and the other defendants, who subsequently purchased the land, with knowledge of *Osborn's* contract.

Now, the instrument, which was signed by *Osborn*, and the only one, as the case shows, which he ever did sign, contains no agreement to convey the land to the plaintiff. Without the aid of parol testimony, it would be very difficult, if not impossible, to say what the parties meant and intended, by that instrument. If not utterly void for uncertainty, it is so very vague and uncertain, that no court of chancery would ever decree any specific execution of a contract proved only by the instrument itself.

Indeed, this is not claimed by the plaintiff. And the case itself shows, that the writing was never made for the purpose of being executed by *Osborn;* and he signed it, through mistake, for another which he never did sign. The plaintiff thereupon calls upon the court to correct the agreement, and make it as the parties intended it should be, and then enforce the execution.

This was done, by the county court ; and for the purpose of ascertaining what the parties intended to do, the court received parol evidence in support of the plaintiff's claim, and decreed the execution of the contract, as established by the aid of that evidence. The enquiry now is, whether that was legally done, and is not in violation of the provisions of our statute.

This question was very fully considered, in a case before Lord *Redesdale*. *Clinan* v. *Cooke*, 1 *Scho. & Lef.* 22. There, a bill was filed, praying for the specific execution of an agreement for a lease of certain lands for three lives. The defendant had caused an advertisement to be inserted in the public papers, that the lands in question were to be let for three lives, or thirty-one years, and directing application to be made to one *Meagher*. The plaintiffs, in consequence, applied to *Meagher*, and he made and signed an agreement, which stated, that the defendant had demised to the plaintiffs the lands, at a certain rent, but omitted to state the term for which they were leased.

One question was, whether that omission could be supplied, either by a reference to the advertisement, or by parol evidence. For the plaintiffs, it was contended, that though the agreement, taken singly, might be defective, in not expressing the term for which the lease was to be made, yet that deficiency was supplied, by a reference to the advertisement, in which the term for three lives or thirty-one years, was expressed ; and *Meagher*, who subscribed the agreement, was the person referred to, by the defendant himself, in the advertisement.

But the chancellor held, that the omission could not be supplied, in either mode : not by a reference to the advertisement, because the agreement contained no such reference, and the two instruments could not be connected together by parol evidence ; nor could the omission be supplied by such evidence, because, that, in effect, would be, to charge a party upon a contract not made in writing and signed by him.

That case has ever since been considered as a leading one upon this subject; and if the doctrine contained in it, is well founded, it is decisive of the one under consideration.

A different doctrine is supposed to have been holden, by Chancellor *Kent*, in *Gillepsie* v. *Moon*, 2 *Johns. Ch. R.* 585. But that case is clearly distinguishable from the former. There, a bill was brought to rectify a mistake in a conveyance to the defendant, which, by an error in the description, conveyed the whole lot, or 250 acres, instead of 200 acres, parcel of the same ; and the conveyance was rectified. The court held, that whether the error was occasioned by the fraud of the grantee, or the mistake of the parties, the deed should not have the full operation imported by its terms, contrary to the design and intent of the parties. As has been well said of this case, " it is one thing to limit the effect of an instrument, and another to extend it beyond what its terms import." *Elder* v. *Elder*, 1 *Fairf.* 80.

But this question subsequently came before the supreme court of the state of *Maine*, and the two preceding cases, and others upon the same subject, were carefully reviewed. There, a bill was brought for the specific execution of a contract for the conveyance of a lot of land, lying in the towns of *Windham* and *Westbrook*, being in one parcel. The written agreement was for the sale of a lot situated in *Windham* ;

and the plaintiff claimed, that there was a mistake in writing the memorandum of agreement, and prayed that it might be corrected and the whole lot conveyed to him. But the court held, that it was not competent for the plaintiff to make out his case, by parol evidence, and dismissed the bill.

So also in another recent case, Mr. *Baron Alderson* remarked : " I cannot help feeling, that in the case of an executory agreement, first to reform, and then to decree an execution of it, would be virtually to repeal the statute of frauds." *Attorney General* v. *Sitwell,* 1 *Younge & Coll.* 559. 582, 3. cited 1 *Sto. Eq. c.* 5. *s.* 161. *in notis.*

These cases appear to be founded upon a just and reasonable construction of the statute, and fully establish the rule, that if two parties enter into an agreement respecting the sale of real estate, and fail to reduce that agreement to writing, according to their intention, it is not competent for the purchaser to come into a court of chancery, for the purpose of having the written agreement rectified, by the aid of parol evidence, and then the execution enforced.

But this rule does not apply where the mistake is set up by way of defense against a claim for the specific execution of a contract. In such case, the object is not to enforce the execution of a parol agreement, but to prevent the execution of a written one, which the parties never intentionally made— to resist one which to enforce would be inequitable and unjust.

It was not the object of the statute to give any greater efficacy to written contracts for the sale of lands, than they possessed at the common law ; but merely to require such contracts to be made in writing, in order to lay the foundation of a suit at law or in equity.

It is however insisted, that in this case, there were two instruments, executed by the parties, at the same time, as parts of one transaction, and that they are to be taken together, in determining the contract. If this were done, the uncertainty, without any light from parol testimony, would not be removed. The instrument executed by the plaintiff is as vague and indefinite as the other. But when we let in parol evidence, and learn from it, that each instrument was executed by the wrong party, the whole difficulty vanishes. So that we are

still brought back to the question, whether parol evidence is admissible to show the mistake.

Again, admitting that both instruments taken together would sufficiently show what the agreement was, still there is the same difficulty in the way. *Osborn* signed but one of them, and that one contains no reference to the other. We cannot learn from it, that any other ever existed. How then can it be said, that the writing executed by the plaintiff, was *signed* by *Osborn?* The case shows, that it was drawn for him to execute, but by mistake, that was not done.

Suppose the contract had been fully and correctly drawn, and *Osborn,* by mistake, had never signed it; could it be enforced in the face of the statute? Clearly not. The plaintiff's case might be a hard one, but he would be remediless. And in our judgment, it makes no difference, whether he entirely omitted to sign the agreement, or through mistake signed the wrong one, provided the one he did sign, does not show an agreement on his part to convey the land to the plaintiff.

Had the writing signed by *Osborn* referred to the one executed by the plaintiff, as containing, in whole or in part, the agreement, the case would be different. The two instruments then might be treated as one. The case of *Clinan* v. *Cooke,* already cited, is directly in point. There it was held, that the omission in the agreement could not be supplied by the advertisement, because the former contained no reference to the latter. The same principle governs the present case.

Again, it is said, that here has been a part execution of the agreement, which will relieve the case from the operation of the statute, and let in parol evidence to show the agreement. Now, the ground upon which courts of equity interfere in such cases, is, that otherwise one party might practice a fraud upon the other. What fraud has been practiced, by either of these defendants, in relation to any part execution by the plaintiff?

No part of the purchase money was ever paid by the plaintiff, and no act done by him, which he could not have done, if he had never made any such agreement. The only circumstances relied upon by him, to show such part execution, are the possession of the property, and the erection of the mill.

With respect to the former, the case does not show any

possession, as against either of these defendants. The land, at the time of the agreement, was under a lease, made by a previous owner, to one *Hubbard*, and so continued until the 1st of *April* following ; and of course, during all that period, the possession was beyond the controul of either of the defendants.

*Hartford,*
June, 1848.

Osborn
*v.*
Phelps.

It appears that soon after the agreement was made, which was in the month of *August,* 1844, the plaintiff took possession of the land, and continued in possession, for a period of about seven months, which would expire about the time of the expiration of the lease. With that possession, therefore, neither of the defendants could interfere ; nor does the case show that either of them ever assented to the plaintiff's taking possession.

As to the erection of the mill : it was no part execution of the contract made with *Osborn*. The mill was not erected upon the land in question, but upon other lands of the plaintiff. It was no part of the agreement that it should ever be erected ; and the court has found, that it did not appear whether the plaintiff would, or would not, have erected the mill, had he made no contract with *Osborn*.

The only effect to be given to the erection of the mill, was, that in such event, the plaintiff might have the land at a reduced price.

The defendants, in permitting the plaintiff to hold possession of the land, during the continuance of the lease to *Hubbard*, and while they had no controul over it, and in suffering him to erect a mill upon his own land, at his own pleasure, were chargeable with no fraud towards the plaintiff ; and the acts done by him, under such circumstances, cannot be considered as such part execution of the agreement, as will exonerate it from the operation of the statute.

Upon the whole, therefore, we are satisfied, both upon principle and authority, that parol evidence was not admissible for the purpose of showing the contract in fact made by *Osborn*, and having the execution enforced : and that, without the aid of such evidence, no contract is shown, which can be enforced, in the manner stated in the decree of the county court ; and consequently, that decree is erroneous, and ought to be set aside.

Other errors have been assigned, which, after the view already taken of the case, we deem it unnecessary to consider.

In this opinion CHURCH, Ch. J., and STORRS and HINMAN, Js., concurred.

ELLSWORTH, J.    I am not without apprehension that the obvious justice of this case may lead me to appreciate inadequately the errors assigned on the record.    Nor is this apprehension lessened, when I find, that my opinion differs so much from that of some, if not all, of the court.    But after much reflection upon the chief points discussed at the bar, I am constrained to say, that my views remain unchanged. It should be remembered, the decree complained of, does, of itself, without requiring any act of coöperation on the part of the defendants, transfer to and vest in *Phelps,* the land in question ; and therefore, if *Phelps* is justly entitled to it, they cannot complain, unless they should have had costs awarded to them, which, for reasons hereafter to be stated, will appear not to be the case.

The principal, if not the only, insuperable difficulty, in the minds of some of the court, arises from the statute of frauds and perjuries.    I feel this difficulty myself; and were there nothing in the case besides this abstract question, I might not express a dissenting opinion : for although I am not satisfied with the arguments used, yet I do not deny, that the modern *English* authorities, and perhaps the preponderating weight of *American* authorities, are in accordance with the decision just expressed.    But the case of *Gillespie* v. *Moon,* 2 *Johns. Ch. R.* 585. which was decided by Chancellor *Kent,* in full view of the *English* cases, followed up by the approbation of Judge *Story,* (1. *Sto. Eq. s.* 161.) is well calculated to create doubt, and especially as *Washburn* v. *Merrills,* 1 *Day,* 140. seems to be a case of like character, and was decided against the objection now made.    I will, however, state, in a few words, the reasons of my dissatisfaction.

There is no part of the jurisdiction of courts of equity more fully established, more important, or ancient, or more generally exercised, than that of reforming written contracts. This jurisdiction is founded in such sound sense and obvious necessity, and withal, rests so much in the sound discretion

of the court, that no lawyer or judge will call its propriety in question, or wish its extent abridged. The party injured, or likely to be injured, by a clear mistake, founded in accident or fraud, may at once apply for relief or protection, without waiting to be made a party defendant. In principle, he stands on the same ground, whether he seeks for relief, or resists an inequitable claim. If a writing does not express the agreement of the parties, the correction should be made while the proof is at hand; and if necessary, a court of equity should lend its aid to see that it is done. Errors are incident to human affairs; and there must somewhere rest a power to grant relief, or there is a great defect in the administration of justice. Take, for illustration, the case of *Washburn* v. *Merrills.* There, *Solomon Sanford* executed to *Rachel Mc-Donald* an absolute deed, when the parties intended it should be a mortgage. Upon proof of the mistake, the representative of the grantor had the mistake corrected; and then he was allowed to redeem.

Indeed, I do not understand, that the court call in question this general remedial power of equity. It cannot be denied. Lord *Hardwicke,* in *Hinckle* v. *The Royal Exchange Assurance Company,* 1 *Ves.* 314. says, (what is found in the entire body of decided cases and elementary writers,) " no doubt this court has jurisdiction to relieve in respect of a clear mistake in written contracts, as well as of fraud in writings." Nor, independent of the statute of frauds, is there any difference or difficulty, whether the subject of the contract be real or personal estate. Whenever or wherever there is a plain mistake in fact, equity must afford relief, or else the most prudent and vigilant will often be ruined through inadvertence or fraud. Now, the statute was never intended to wrest from courts of equity this portion of its jurisdiction. Such is neither its language nor purpose. Its language is, " That no suit in law or equity shall be brought," &c.; not that equity shall not, as before the statute, exercise its beneficent and remedial power to reform written contracts. If a policy of insurance expresses too much, or too little; or a note of hand, a charter-party, a deed, a covenant or other writing, by reason of fraud, mistake or surprise, is defective or false; it is the daily practice of courts of equity to lend their interposition, whether the party be plaintiff or defendant; and no matter to what kind of property it relates.

*Hartford,*
June, 1848.
——————
Osborn
*v.*
Phelps.

Besides, the party asking to have a contract reformed, does not, of course, ask more. This may be all he needs for his security; and he may be under no necessity "to sue in law or equity." If he should be, at any time, the reformed writing will satisfy the provisions of the statute.

But further, the statute is not held to be so inexorable and stringent in its application, as its language imports. Suits in equity *are* brought, not unfrequently, where there is no note or memorandum whatever. The reason is, courts of equity will not allow a statute to be made the instrument of injustice, which was framed and designed to secure the contrary. Hence fraud is relieved against. So relief is given in case of part performance, for a like reason. It should be so, when the statute is used to take away a portion of the acknowledged jurisdiction of courts of equity. Why make the statute a trap to catch those who are so unfortunate as to commit a mistake in the writing, though it may not be through fraud? The statute is no more repealed, in the one case than in the other. Suppose an agreement is made upon consideration of marriage, (a clause of the statute not affected by part performance,) and the marriage is had, and it is found that the marriage settlement, through misdescription, perhaps a wrong reference, or the signing of a wrong paper, is defective, while the parties intended, and in fact understood, that the contract of settlement had been reduced to writing and signed; can there be no relief in favour of the suffering party, unless a case of palpable fraud is made out? It is conceded that the statute does not prevent a defendant from setting up, in his defense, a mistake in a written contract to convey land. This would be inequitable, and is not within the language of the statute. So one exposed to be sued at law, on a like contract, is not hindered from obtaining an injunction, notwithstanding the writing be clear and explicit. So, in the case of a mere correction of a mistake, nothing is asked for against the *language* of the statute. It would be deeply to be regretted, that in such a case, a statute made to prevent injustice, should be used, because of its technical language, to work injustice, when in truth the correction of mistakes, from whatever cause existing, is not within the purview of the statute, but belonged always to the jurisdiction of courts of equity. To

illustrate my views: suppose that in contracting to sell a house in this city, I am made to say in the contract of sale, (by reference for description to a wrong deed,) that I engage to sell the *City Hotel*, which is worth 20,000 dollars, when in fact, for 1,000 dollars, I had engaged to sell a house adjoining the *Hotel*. I may, in this case, resist an application for a specific execution, and may show, by parol, the mistake made. So, if sued on the contract, I may obtain an injunction to arrest the suit at law. Now, suppose that for 20,000 dollars paid me, (and which I may be entirely unable to refund,) I had contracted to sell the *City Hotel*, but the writing is so drawn that I am made to say, (through a like mistake,) that I engage to sell the adjoining house. Is the purchaser remediless? Will the statute exclude the enquiry, by parol evidence, in the one case, and not in the other? Cannot equity afford relief in both cases, without violating the language or spirit of the statute? I confess, I cannot see any substantial difference between the two cases. If there be any, it is one of nice technicality, quite foreign to the intent and aim of the statute.

Here, the parties may well be taken to have agreed, that their contract should be instantly put into writing. They attempted to do it. They supposed they had done it. In fact, they had done it, except that each party had inadvertently signed the wrong counterpart of the contract.

These are briefly the reasons why I am not able at present, to yield assent to the view of this question, taken in the modern cases in *England*.

As I have already intimated, I choose to place my opinion on another ground. I hold, that the two writings recited in the bill, are parts of one contract, together furnishing a sufficient memorandum or note to satisfy the requisition of the statute. These writings are evidently counterparts, making together one agreement. Writings executed between the same parties, at the same time, about the same subject matter, and to effect the specific object, are held to be parts of the same contract. Thus Ch. J. *Shaw*, in giving the opinion of the court, in *Perry* v. *Holden,* 22 *Pick.* 269. 277. lays down the rule thus: " Instruments made at the same time, between the same parties, to accomplish one and the same object, should be construed and taken together." In *Chickering* v.

*Hartford,*
June, 1848.

Osborn
*v.*
Phelps.

*Lovejoy* & al. 13 *Mass. R.* 51. 55., the court say: "The deed from *Withington* to *Wilcox*, and that from the latter to the demandant, were executed at the same time; and all the other acts necessary to give them validity, were simultaneous. These deeds, then, must be considered as parts of the same contract." The same is held in *King* v. *King*, 7 *Mass. R.* 499. and in *Carey* v. *Rawson*, 8 *Mass. R.* 159. So in *New-York*, in *Stow* v. *Tifft*, 15 *Johns. R.* 458. 463. *Spencer*, J. says: " I am authorized to say, by the decision of this court, in *Jackson* v. *Dunsbagh*, 1 *Johns. Cas.* 95. that where two instruments are executed at the same time, between the same parties, relative to the same subject matter, they are to be taken in connexion, as forming together the several parts of one agreement." The same is held in *Jackson* d. *Trowbridge* & ux. v. *Dunsbagh*, 1 *Johns. Cas.* 91. 95. above referred to. In *Crop.* v. *Norton*, 2 *Atk.* 74. the Lord Chancellor says: " But when writings are executed so near together, it is very natural to think they are all in pursuance of one transaction and agreement between the parties." In *Isham* v. *Morgan*, 9 *Conn. R.* 374. 378. this court held, " that where two instruments are executed at the same time, between the same parties, relative to the same subject matter and to effectuate one object, they are to be taken in connexion as forming parts of the same agreement." The same is held in *Bates* v. *Coe*, 10 *Conn. R.* 292. The rule laid down in 1 *Smith's Leading Cases*, 216., as deduced from the books, is this: " Provided that the agreement be reduced to writing, it matters not out of how many different papers it is to be collected, so long as they can be sufficiently connected *in sense.*" *Jackson* v. *Lowe*, 1 *Bing.* 9. (8 *E. C. L.* 222.) *Phillimore* v. *Barry*, 1 *Campb.* 513. *Saunderson* v. *Jackson*, 2 *Bos. & Pul.* 238. *Allen* v. *Bennet*, 3 *Taun.* 169. *Dobell* v. *Hutchinson*, 3 *Ad. & Ell.* 355. (30 *E. C. L.* 118.) *Johnson* v. *Dodgson*, 2 *Mees. & Wels.* 653.

Let now the rule be applied to the case in hand. The parts, evidently imperfect, are counterparts of the same agreement, and both are essential to make out the whole. To use the language in *Isham* v. *Morgan*, " the two instruments are executed at the same time, between the same parties, relative to the same subject matter, and to effectuate one object." When read as parts of the same agreement, we

find in it all the constituents of a perfect obligation in writing. The subject matter is certain ; a piece of land is described in both, in the same words, sufficiently explicit ; the vendor, the vendee, and the purchase money, are certain. What more is wanting, in order to satisfy the statute ? Put these counterparts together, and let the entire writing be considered as signed by both parties to the agreement, and all difficulty vanishes at once.

Another ground may be taken equally decisive for the defendant in error, upon the facts found. The county court found, that upon the execution of the writings of *August* 1844, the purchaser took possession of the land, in full reliance upon the faithful performance of said contract, " *under and by virtue of the same ;*" and retained possession seven months. It was agreed, that taking possession is such part performance as that the statute of frauds presents no difficulty, though there be no writing at all, if the agreement can be satisfactorily made out, by parol. To avoid the effect of a fact so decisive on this objection, the plaintiffs in error say, there was an outstanding lease in one *Hubbard*, extending through these seven months. But it is only found, that when *Osborn* bought this land of one *Kinsley, Hubbard* had a lease of it for a year from the 1st day of *April* 1844. It is not found, that at or after the contract between *Osborn* and *Phelps, Hubbard* claimed any right under the lease, or that it was in force, or that *Hubbard* was in possession under it. For aught that appears, (and as *Osborn* does not notice it, in his sale to *Phelps*, in *August* 1844, I take it to be so,) *Hubbard*, perhaps to save the payment of rent, renounced his lease, or at all events, did not keep up any possession inconsistent with the absolute finding of the court, that immediately after the 26th of *August* 1844, *Phelps* took possession " under and by virtue of the contract." Even the continuance of the lease would not be inconsistent with *Phelps'* taking possession. He may have entered with *Hubbard's* consent, and excavated the land, or built upon it, or expended money for the repairs, or received rent. Some or all of these things may be presumed under the *unqualified* finding of the court. At all events, I cannot see such contradiction as to say *Phelps could not,* and therefore did not, take possession of this land. And as to a part of the land, *viz.* a strip

*Hartford,*
June, 1848.

Osborn
*v.*
Phelps.

three rods wide on the highway, the court finds, as I under-stand the record, that *Hubbard* was not in possession of that, on or after the 26th of *August* 1844. So much he had aban-doned; and if *Phelps* in fact took possession of that, and re-ceived rent for the enjoyment of the rest, the finding of the court is decisive.

If, however, *Phelps* did take possession, as now claimed, it is said it was not done as part performance. The court, it is true, does not find any express consent given by *Osborn*, and that *Phelps* should take possession. Nor was an express consent necessary. An implied consent was enough. The court finds, that *Osborn* sold the land, without making any reservation of the lease. Perhaps he had arranged to have it given up, and *Phelps* took possession immediately upon the purchase, under and by virtue of the contract, and kept it for seven months. In my judgment, this is enough, and more than can be proved ordinarily, in cases of part performance.

Again, it is said, that the acts to be done by the parties, are concurrent; and that *Phelps* did not tender the purchase money in season, if at all; and not having performed on his part, he cannot properly ask for a deed. By the terms of the contract, the amount of the purchase money is to depend on the quantity of land, which, of course, is to be ascertain-ed, by and at the expense of the *vendor;* and if the mill is not built, the price is to be 50 dollars more. If now the land is to be measured by *Osborn*, before the deed is made, not to say, (which perhaps might be said,) that the land is not to be conveyed until after the mill is built, this objection, and es-pecially if we consider what *Osborn did* do, comes with a bad grace from him. He did nothing, on his part, which he should have done, to forward the completion of the contract, but much to prevent it. His aim was, to cheat *Phelps :* by a fraudulent conspiring with others, to subject *Phelps* and his entire establishment, to the cupidity, if not the mere will and caprice, of fraudulent associates. On or about the 18th day of *December* 1844, without having done a single thing by him to be done, and without any complaint of delay by *Phelps*, he conveys the land to *Hamilton* and *Abbe*, who were cog-nizant of the facts, while too *Phelps* is in the possession and enjoyment of the land. After this, *Osborn* could not make a good and clear title. He intended to render it impossible,

except on his own terms ; but this is not all. On the 1st of *March* following, *Phelps* called on *Osborn* with a bag of dollars, to pay him for the land, according to the contract, and to take a deed, not even specifying the kind of deed ; (and under the circumstances, a release deed would be worth nothing.) He is met with a flat denial. *Osborn* utterly declined and refused to go on with or perform said contract, or to have any thing further to do therewith. In my judgment, this is a waiver of any further or future attempt, on the part of *Phelps*, to get a title from *Osborn*. The other defendants stand on no better ground. Though they were in fact requested to comply with the contract, the title is justly taken from them all ; nor are they entitled to costs. The money is lodged for them with the clerk, if in justice it belongs to them. I confess my sympathies are not at all excited in behalf of these confederates in iniquity. Besides, the exact time of performance, *i. e.* of paying the money and conveying the land, was not considered or treated, by the parties, as important. *Osborn* had done nothing to ascertain how much would be due to him. *Phelps* was in possession, and both parties were satisfied, until *Osborn* undertook to break up the contract, and place the interests of *Phelps* at his mercy, or the mercy of others of a kindred character.

It has been said at the bar, that the bill is bad, in not alleging that a tender of the money and demand of a deed, were made in a reasonable time. It is alleged, that the plaintiff has always been ready and willing to perform his part of said agreement, yet said *Osborn* has always neglected and refused ; and this is found to be true. The facts, too, which go to show, that the tender and demand were in due time, and the conduct of the parties, are stated. This is enough, especially upon the plea of a general denial.

Again, it has been said, that the decree is defective in not directing a final division of the money. The court was not asked to divide it, nor to give it any direction whatever. It was not furnished with the means of knowing how the parties stood among themselves in relation to the money. If any thing of this kind be necessary, it can still be done.

Decree of county court reversed.