JOHN B. HUNTER, Administrator of Samuel W. Hunter, deceased, Appellant, *v.* WESLEY A. BILYEU, and FINIS BILYEU, Appellees.

APPEAL FROM BOND.

The power to correct a mistake in a writing, is as much within the scope of the jurisdiction of a court of equity, as to correct any other mistake ; and parol evidence may be resorted to, for the purpose of proving what was the real contract made by the parties.

The writing may then be reformed in accordance with the intention of the parties, and a specific performance may then be decreed.

It is in the discretion of the court to correct the mistake, or to leave the parties to the operation of the common law rule, which forbids the introduction of parol evidence to vary a written contract, but the power of the court will not be exercised to make the correction, without the strongest and most convincing evidence of its justice.

THIS was a bill in chancery, filed by appellees against appellant, and William A. Hunter, Francis C. Hunter, Martha A. Hunter, John P. Hunter, and William S. Sherrod, guardian of the four last named (minors) defendants, David Hunter and Joseph Smith, in the Circuit Court of Bond county, 1857, for an injunction to stay proceedings at law, and for relief. The bill charges that Samuel W. Hunter, in his lifetime, on or about the first day of April, 1850, agreed to convey to said complainants certain tracts of land, which are fully described in the bill.

The bill further states, that said Samuel W. Hunter drew up a bond at the time for a deed, which is marked Exhibit A, and made part of said bill, which did not include the three last tracts of land described in the bill; that said Samuel W. Hunter had no deed to one of the tracts, but expected to get one from David Hunter; that Samuel W. Hunter did afterwards execute a bond for the last mentioned tract (for a building spot) to Finis Bilyeu, marked Exhibit B, and made part of the bill.

The bill further charges, that the said Samuel W. Hunter, in pursuance of said agreement, drew an order on David Hunter for a deed to said twenty acres to complainants; that some time afterwards Samuel W. Hunter refused to make a bond for said forty acres, but afterwards sold the same to Joseph Smith, who had full knowledge of complainants' rights, and is made defendant.

The bill avers, that in the bond the description is so vague and uncertain, and it contained so many errors that complainants were compelled to cause the description of the land in the bill contained to be made, and aver its correctness and the land intended to be conveyed; that at the time of making said agreement, said Samuel W. Hunter represented himself as being the owner of all said lands, or as being able to procure title to them; that, relying upon said representations, and that said lands contained the number of acres represented, complainants agreed to pay for them about fifteen hundred dollars, as follows, to wit: by paying divers promissory notes given by S. W. Hunter to various persons, and three notes given by complainants to S. W. Hunter, dated March 30, 1850, one for $351, payable March 30, 1853; one for $400, payable March 30, 1854; and another for $400, due March 30, 1855; all of which notes they paid, except the last one.

That the complainants, not being acquainted with the legal manner of describing lands, did not discover, until very recently, the mistakes and errors in said bond, but supposed it contained the true description of said lands to be sold by and purchased from said S. W. Hunter. That fully believing, upon the payment of the last named note, they would get

from S. W. Hunter a good title to said lands, complainants paid the said several notes according to agreement.

That Samuel W. Hunter died on or about the first day of January, 1852, leaving, as his only heirs-at-law, William A. Hunter, Martha A. Hunter, Francis C. Hunter, and John P. Hunter, all minors, and that W. S. Sherrod is their guardian, and John B. Hunter is the administrator of Samuel W. Hunter, deceased.

The bill further shows, that John B. Hunter, administrator of Samuel W. Hunter, filed his petition in the Circuit Court of Bond county, Illinois, to the September term thereof, 1855, asking for an order authorizing him to make a deed to complainants for the land described in both of said bonds; and that in said bill all the errors and mistakes were carried into said bill, together with another error, to wit: instead of describing the lands as being in section twenty-three, they were described as being in twenty-five; that Samuel W. Hunter never owned such land as described in said bill or petition, nor did complainants ever contract for any such land. Complainants admit that they were made defendants to said proceeding by said administrator, but they did not appear, supposing the lands were described as in the bond, and that their being made defendants was mere legal ceremony, they did not think it necessary for them to attend, the said proceeding, so far as it went, being consistent with their rights, as they supposed. But so it is, the errors in the bond and the error describing the land as being in section twenty-five instead of section twenty-three, were carried into the decree of court in said proceedings by said administrator, and also in the deed tendered to complainants, and by them refused for the reason that said deed did not contain the lands agreed to be conveyed.

The bill further charges, that said administrator has commenced and is now prosecuting an action at law in the Circuit Court at this term of said court, against complainants, to collect said last mentioned note; that unless he is restrained he will recover and collect the same, in which case complainants sustain great injury, and will be deprived of getting a good title to their lands agreed to be conveyed to them by

said S. W. Hunter, which constituted the sole considera-
tion to the note and undertakings of complainants in the
premises. That fifteen hundred dollars was full and adequate
price for said lands, as the inducement to their making said
notes herein set forth, and their other undertakings in the
premises. That they would never have paid said moneys for,
or to said S. W. Hunter, if they had not believed and confided
in the representations of said S. W. Hunter in being able to
convey the lands set forth in the fore part of this bill, and a
failure to convey the same would work great and irremediable
injury and wrong to complainants.

That immediately after said agreement, complainants took
possession of and put valuable improvements upon those lands,
to the amount of one thousand five hundred dollars.

The bill concludes with the usual prayer for an injunction to
stay the proceedings at law to collect said note, for a guardian
*ad litem* for minor defendants, to annul the decree of the
Circuit Court in behalf of said administrator, or to amend and
correct the same so as to comport with justice, and for a decree
compelling defendants to convey to complainants individually
or collectively, all the lands agreed to be conveyed by said
Samuel W. Hunter; and for general relief; and the usual
oath by Wesley A. Bilyeu.

On the 3rd day of June, 1857, complainants filed their bill
and a bond in the usual form, in the clerk's office of Bond
county, and on the 5th day of the same month a writ of in-
junction issued, and was returned on the 7th day of June,
1857, served upon John B. Hunter, and S. P. Moore, his
attorney; and afterwards, on the 18th day of September,
being at a regular term of said court, and summons being
returned, served on said defendants, either personally or by
publication, the court appoints J. P. Shields guardian *ad
litem* for the minor defendants, who answers that he knows
nothing of the facts as set forth in the complainants' bill,
and can neither admit or deny them, and asks the court
to hold the complainants to strict proof; and on the 19th
day of September, at the same term of the court, the said
John B. Hunter, administrator as aforesaid, by his attorney,

filed his demurrer to said bill, which demurrer was overruled by the court. On the same day, and at the same term of said court, default was taken against David Hunter. Joseph Smith, one of the defendants, at the same time filed his answer to said bill, stating that he did purchase of Samuel W. Hunter a certain tract of land which he described, and which is part of the land described in complainants' bill. That the stipulated price for said lands, between him and Hunter, was nineteen hundred dollars, a large amount of which was paid down, and the balance in payments becoming due at different times; denies that he ever had, at any time, any knowledge of any contract between complainants and S. W. Hunter for the purchase of said lands, and pronounces the charges in said bill false. That he was negotiating for a considerable time for said lands before he purchased, which fact was well known in the neighborhood; that complainants lived near S. W. Hunter at the time; that said complainants rested quiet for a great length of time after said purchase by respondent.

And on the 12th day of April, at the April term of said court, 1857, said John W. Hunter filed his answer to complainants' bill, stating that the said S. W. Hunter did, on or about the time charged in said bill, sell certain lands to complainants, but denies that any other lands than those included in said bonds (A. and B.) were agreed to be sold to complainants by S. W. Hunter, and those, too, only upon the conditions stated in said bonds, except a tract owned by David Hunter, for which S. W. Hunter gave a written order for a deed, but charges that said order only called for one-half of said tract, to wit, ten acres, to be conveyed to complainants upon the conditions stated in said bonds A. and B.; denies S. W. Hunter afterwards sold said tract to Joseph Smith, or ever agreed to give a bond for a deed for the same to complainants; denies any knowledge of the representations of S. W. Hunter as charged in said bill at the time of said sale. Does not believe said Hunter ever made any such representations as charged in said bill.

The answer admits, that S. W. Hunter died as stated in said

bill; that his legal representatives are properly set forth in the same, and respondent is his administrator; that respondent filed his petition in said court, and that complainants were defendants to the same, and failed to answer thereto; admits there was a mistake in the number of the section of said land; that the number should have been twenty-three instead of section twenty-five; but avers that respondent had always been ready and anxious to correct said error and make a deed according to said bond; but avers complainants utterly refused to comply with their agreement, and take a deed accordingly. Admits he has entered suit for said last note as charged in said bill, but denies complainants would suffer any wrong by the collection of the same; states that the lands included in said bonds are fully worth the sum of fifteen hundred dollars agreed to be given for them. Denies that complainants ever took possession of, or put valuable improvements upon, any lands which were agreed to be conveyed to them, other than those included in the bonds.

General replication was filed; leave to file additional pleas; and cause continued to next term.

At September term of said court, demurrer overruled. A plea, setting up the statute of frauds and perjuries, filed by J. B. Hunter. Cause continued to April term, 1859. At said April term, death of Joseph Smith suggested; supplemental bill filed; cause continued.

At September term of said court, 1859, parties all in court. Benjamin Bond was appointed guardian *ad litem*, and answers for the minor heirs of Joseph Smith, deceased, (one of the said defendants,) asking the court to hold the complainants to strict proof, and prays the answer of the said Joseph Smith to be taken as their separate answer. And this case being heard, the court decrees that the heirs of Joseph Smith be dismissed with their costs, and that their title to the land claimed in this suit by complainants be affirmed, and that John B. Hunter, administrator of S. W. Hunter, make a good and sufficient deed to the lands described in said complainants' bill, except that part of the west half of the north-west quarter Section twenty-three, which lies east of Shoal creek,

16

(not including the building spot belonging to Finis Bilyeu), also that part of the east half of north-east quarter Section twenty-three—twenty acres, known as the Gillespie tract—which two tracts were referred to the master in chancery to take testimony and compute the value of the same at the time of the commencement of the suit at law, and also to compute the amount due on the note, and report the same to this court. Cause continued.

At the April term of said court, 1850, said master made his report, stating the value of the land referred to him by said decree of court, to be $1,204.75, half of which is $602.37½, and the amount of the note $604; to which report, defendant, John B. Hunter, excepts; which exception was overruled by the court.

At the same term the court approved said master's report, and made another decree ordering that said complainants be allowed $602.37, and that the same be deducted out of the amount due on said note sued on; that upon the payment to John B. Hunter, by said complainants, of the sum of one dollar and sixty-three cents, the said John B. Hunter, administrator of Samuel W. Hunter, be forever enjoined from collecting said note, and that said Hunter, as administrator, within thirty days from the date of this decree, make a deed conveying the lands to complainants, as by former decree of this court required, and in his default, the master in chancery is appointed to execute and deliver said deed; that defendants, with exception of the heirs of Joseph Smith, deceased, pay the costs of this suit; that John B. Hunter pay the same in due course of administration ; and that complainants have execution against the other defendants. Whereupon, said John B. Hunter prays an appeal to the Supreme Court, which is granted, and appeal perfected.

The evidence, so far as it is necessary to a complete understanding of the case, is given in the opinion.

W. H. HERNDON, and S. P. MOORE, for Appellant.

In construing written contracts, courts will look to the intention of both or all the parties. Parsons on Contracts,

vol. 2, pp. 6 to 9, and notes. Courts cannot make a contract for the parties. *Shirley* v. *Spencer*, 4 Gilm. 583. In this case, the bill describes other lands (and the decrees enforce the conveyance of them) than those described in the bond "A," as we understand it. Mistake must be mutual. 3 Greenl. Ev., sec. 363.

The statute of frauds and perjuries applies. *Updike* v. *Armstrong*, 3 Scam. 564, 566.

In this case the evidence does not support the bill nor the report of the master.

J. & D. GILLESPIE, for Appellees.

The defendants in error insist that the decree made in this case by the court below was imperatively required by the evidence.

The evidence shows that Hunter, in his lifetime, sold all the lands to the defendants in error, for about the sum of $1,500; that all the money was paid except the last note for the sum of $400 and interest; that there was a mistake in the description of the land included in the bond from Hunter to the defendants in error; that all the land sold was not included in the bond; that the Bilyeus had possession of all the lands decreed to be conveyed to them; that, as to the lands not decreed, Hunter, in his lifetime, had sold one of the tracts to Smith, an innocent purchaser, without notice, and the statute of frauds having been relied on, there was not sufficient evidence of possession of the Gillespie tract to authorize a decree.

Defendants in error insist that the court was compelled to deduct the value of the lands sold and not decreed to be conveyed, from the amount of the note which was given for the lands sold by Hunter to defendants in error.

BREESE, J. John B. Hunter, as administrator of Samuel W. Hunter, deceased, brought his action in the Circuit Court of Bond county, against Wesley A. and Finis Bilyeu, on a note executed by them to the intestate, dated March 30, 1850, and due March 30, 1855. Pending the action the defendants

obtained an injunction on their bill of complaint, to which the administrator, and the heirs-at-law of the intestate, who were minors, and their guardian, together with Joseph Smith, were made defendants.

The bill alleges, that the note sued upon, together with others which were paid, was one and the last of a number of notes they had executed to the intestate, for certain lands lying in Bond county, for which a bond for a deed was executed and delivered to them by the intestate. That they were put into possession of the lands, and made lasting and valuable improvements on some of the tracts, but have discovered that one or more tracts, which they supposed they had bought, were not included in the bond. One of those tracts is described as " the old field tract " lying south-east of Shoal creek, and being part of the west half of the north-west quarter of Section twenty-three, in Town five north, Range four west, containing forty and nineteen-hundredths acres; and the other, the "Gillespie tract," being the last half of the north-west quarter of the north-east quarter of the same section, township and range, containing twenty acres; the undivided half of both which tracts, the complainants allege, was purchased by them of the intestate, and was to have been included in the title bond, but by mistake was left out, and these tracts subsequently sold by the intestate to Joseph Smith.

The bill also alleges, that some time anterior to the commencement of this suit on the note, the administrator had filed a petition in the Circuit Court, at the September term, 1855, praying the court for an order to authorize him to make a deed to complainants for the land described in the bond; that this petition contained the same errors and mistakes as are now complained of, with another error superadded in describing the lands as being in Section "*twenty-five.*" The complainants admit they were made defendants, and had due notice of the pending of the petition, but they did not appear to defend, supposing the lands were described as in the bond, and their being made defendants was a mere ceremony, and the proceedings consistent with their rights. That these

errors and mistakes were carried into the decree rendered on this petition, and in the deed which the administrator tendered to them, and by them refused. No exhibit is made of these proceedings or of this deed.

The title bond is alleged to have been written by the intestate, and delivered to the complainants and accepted by them without any objection, on the 30th of March, 1850. In the following year, 1851, the intestate left the State, and in 1852 died, leaving these infant defendants his only heirs-at-law.

The prayer of the bill is, that the court would order and direct the defendants to convey to complainants all of the land agreed to be conveyed to them by the intestate, and to annul and hold for naught the order of the Circuit Court in behalf of the administrator, or to amend and correct the decree so as to comport with justice and good conscience, and perpetually enjoin the collection of the note sued on, until they are able to comply with the understanding of Samuel W. Hunter, the intestate.

The bond is made an exhibit, and describes the lands sold, and to be conveyed on payment of the purchase money. They are, " the undivided half of a certain lot, beginning at the south corner of the south-west quarter of Section 14, Town 5 north, of Range 4 west of the third principal meridian; thence running north fifty poles; thence west to the middle of the channel of Shoal creek; thence down the channel of Shoal creek, to the section line; thence east to the beginning corner, containing thirty-eight acres, more or less. Also, the undivided half of so much of the west half of the north-west quarter of Section 53, Town 5 north, Range 4 west of the third principal meridian, lying on the west side of Shoal creek. Also, twenty poles south from the creek on the east line of said half; thence west to said creek; thence up said creek to the beginning. Also, the undivided half of twelve acres, more or less, of the south-west quarter, Town 4 west of the third principal meridian, commencing at the south-west corner of said section; thence north fifty; thence east to the middle of the channel of Shoal creek; thence down said creek to the section line; thence west to the beginning. Also, two acres and a half of

the west half of the north-west quarter of Section 23, in same Township and Range, commencing at a stake on the east line of said land at the south-east corner of the mile post ; thence south twenty poles ; thence west twenty poles ; thence north twenty poles ; thence east twenty poles, to the beginning." This last tract was in a separate bond to Finis Bilyeu, one of the complainants, made at the same time and on the same conditions, as the bond to complainants jointly, and for convenience, no question being made on it, both bonds are considered as one.

There is a slight apparent ambiguity in the description of the undivided half of twelve acres, which is explained by the plat sworn to by the witnesses, and is the tract on the west side of the creek, contained within the north and south lines of the tract of thirty-eight acres, if extended west to the section line. There is no dispute about this tract. The tract described as "also twenty poles south from the creek on the east line of said half ; thence west to said creek ; thence up said creek to the beginning," is understood to describe the mill yard, having the shape of a rectangular triangle, the south line being the perpendicular, the west line the base, and the creek the hypothenuse. About this tract there is no dispute.

The administrator demurred to the bill, which was afterwards withdrawn, and his answer filed, not admitting the mistake alleged, to which there was a replication. At a subsequent term, he also filed a plea of the statute of frauds and perjuries. Smith also answered, denying any knowledge when he purchased, of any sale of the tract south-east of Shoal creek, in section twenty-three. On the hearing, the bill was dismissed as to him.

Much testimony was introduced on behalf of complainants, for the purpose of showing by the declarations of the intestate, that an undivided half of other tracts besides these, namely, the tracts known as the " old field " tract, sold to Smith, and the " Gillespie " tract, were bargained for and sold, but, for some cause not fully explained, omitted from the title bond.

The lasting and valuable improvements were made by complainants on other parts, about which there is no dispute.

The bill is, in effect, a bill to reform by parol, this title bond by incorporating into it the part lying south-east of the creek, called the "old field" tract, and the "Gillespie" tract, and when reformed, to decree a specific performance. The contract must be reformed before such a decree can pass.

This presents a question which has been much discussed in the courts of this country and of England, and on which there is great contrariety of opinion.

The question is, in a bill to reform a written instrument, in the absence of any allegation or proof of fraud, and on the ground of accident and mistake alone, is parol evidence admissible to prove an agreement to do something further than is contained in the writing, the statute of frauds and perjuries being relied on in the defense, and which that statute requires to be proved by writing?

Whilst in England, the weight of adjudications seems to be opposed to the admission of parol evidence, in this country, it appears to be the other way. One of the leading cases in England, is that of *Woollam* v. *Hearn*, 7 Vesey, 211. It is prominent among the Leading Cases of White and Tudor, part 1, vol. 2, with copious notes by Hare & Wallace, 510.

In this case, the bill filed by Wm. Woollam against Hearn, stated that the rent of seventy-three pounds ten shillings was inserted in the written lease by mistake, or with some unfair view; the real agreement being that the plaintiff was to have the lease upon the same rent as the defendant paid to his lessor, and that he did not pay more than sixty pounds. The prayer was for a specific performance, and that the defendant may be decreed to execute a lease according to the agreement, at the rent of sixty pounds, or such other rent as the defendant paid his lessor. The defendant, in his answer, denied that seventy-three pounds ten shillings was inserted by mistake, or with any unfair view; or that the agreement was that the plaintiff should pay the same rent as the defendant paid, which he admitted was sixty-three pounds. The bill was proved by depositions.

Sir Wm. Grant, Master of the Rolls, said: "By the rule of

law, independent of the statute (of frauds and perjuries), parol evidence cannot be received to contradict a written agreement. To admit it, for the purpose of proving that the written instrument does not contain the real agreement, would be the same as receiving it for every purpose. It was for the purpose of shutting out that inquiry, that the rule of law was adopted.

"When equity is called upon to exercise its peculiar jurisdiction by decreeing a specific performance, the party to be charged is let in to show, that, under the circumstances, the plaintiff is not entitled to have the agreement specifically performed; and there are many cases in which parol evidence of such circumstances has been admitted, as in *Buxton* v. *Lister*, 3 Atkins, 383. There, on the face of the instrument, a specific sum was to be given for the timbers, but it was shown, by parol, that the defendants were induced to give that, upon the representation that it was valued by two timber merchants, which was not true. If this had been a bill brought by this defendant for a specific performance, I should have been bound by the decisions to admit the parol evidence, and to refuse a specific performance. But this evidence is offered, not for the purpose of resisting, but of obtaining a decree, first, to falsify the written agreement, and then to substitute in its place a parol agreement to be executed by the court. There is no case in which the court has gone the length now desired. The evidence offered is to vary an agreement in a material part, and, having varied it, to procure it to be executed in another form. There is nothing to show that ought to be done; and my opinion being that it ought not, I must dismiss the bill."

In the case of *Rogers* v. *Earl*, 1 Dickson, 294, which was a bill to rectify a mistake of the solicitor in drawing a marriage settlement; in *Thomas* v. *Davis*, id. 301, to rectify a mistake in a conveyance by the omission of one of the parcels of land intended to be conveyed; in *Sims* v. *Urry*, 1 Ch. Cases, 225, to prove a mistake in the penal sum of a bond, by writing it forty instead of four hundred pounds,—verbal evidence was admitted.

In *Hardwood* v. *Wallace*, cited in *Targus* v. *Puget*, 2 Vesey, Sen. 195, where it was proposed to prove a mistake in drawing a settlement; and in the *Attorney General* v. *Sitwell*, 1 Younge & Collier, 559, etc., where it was proposed to show, by parol, that in a contract with the crown for the sale of a certain manor, with the appurtenances, the advowson was omitted by mistake,—such evidence was rejected, or deemed inadmissible. In this case Baron Alderson said: "I cannot help feeling that in the case of an executory agreement, first to reform and then to decree an execution of it, would be, virtually, to repeal the statute of frauds."

In cases within the statute of frauds, verbal evidence was held inadmissible, as in *Dwight* v. *Pomeroy*, 17 Mass. R. 303, where the plaintiff, being creditor of an insolvent debtor who had executed a deed of assignment in trust, for the benefit of his creditors, filed his bill against the trustees to reform an alleged mistake in the trusts expressed in the deed. And in *Elder* v. *Elder*, 10 Maine, 80, where the written agreement was for the conveyance of a lot of land in Windham, formerly owned by J. E., and the plaintiff proposed to prove by parol that it was intended to include the adjoining land in Westbrook, under the same ownership, but that this was omitted by mistake. In *Osborn* v. *Phelps*, 19 Conn. 63, an agreement for the sale of land was drawn in two separate instruments, one to be signed by the vendor, and the other by the purchaser, and neither of the instruments contained any reference to the other, but each was signed by the wrong party by mistake. This the plaintiff sought to prove by parol evidence, but the court held it inadmissible.

In other American cases, such evidence has been held admissible. In *Gillespie* v. *Moon*, 2 Johns. Ch. R. 585, which was a bill for relief and for the reconveyance of a grant of land, which had been included by mistake or fraud in a deed of conveyance, verbal evidence of the mistake, on a review of all the cases, was admitted, and a reconveyance decreed. In *Tilton* v. *Tilton*, 9 New Hamp. 385, where tenants in common agreed to make partition pursuant to a verbal award, and executed deeds accordingly; but, in the deed to the plaintiff, a

parcel assigned to him was omitted by mistake; in a bill for relief, verbal evidence was held admissible, and relief thereupon decreed. So in *Langdon* v. *Keith*, 9 Verm. 299, where upon the transfer of a part of several promissory notes, secured by mortgage, an assignment of the mortgagee's entire interest in the mortgage was made, by mistake, instead of a part, relief was decreed upon verbal proof. In *De Riemer* v. *Cantillon*, 4 Johns. Ch. R. 85, where a portion of the land purchased at sheriff's sale was by mistake omitted in his deed to the purchaser, upon parol evidence of the fact the judgment debtors were decreed to convey to the purchaser the omitted parcel. Several other cases are referred to in this note.

It does not appear that the statute of frauds and perjuries was pleaded in any of these cases, though referred to in the argument, and in the opinion of the court.

In *Woollam* v. *Hearn*, and in many of the cases referred to in Hare and Williams' notes to that case, a distinction is made between seeking and resisting specific performance, as to the admission of evidence. It is said, though a defendant resisting a specific performance, may go into parol evidence to show that by fraud the written agreement does not express the real terms, a plaintiff cannot do so for the purpose of reforming the agreement and obtaining a specific performance of it as reformed.

This doctrine is critically examined in *Gillespie* v. *Moon*, 2 Johns. Ch. R. 585, before cited. In that case the bill was filed to rectify a mistake in the conveyance which, by an error in the description of the land, conveyed the whole lot, or two hundred and fifty acres, instead of two hundred acres, parcel of the same.

The mistake is positively denied in the answer, and the point was, is parol proof of this mistake admissible, in opposition to the plain language of the deed, and especially in opposition to the defendant's answer?

It will be seen the statute of frauds and perjuries was not set up in the case.

After entering minutely into the parol proof of the fact of

the mistake, Chancellor Kent says : "The rule in courts of law. is, that the written instrument does, in contemplation of law, contain the true agreement of the parties, and that the writing furnishes better evidence of the sense of the parties, than any that can be supplied by parol. But equity has a broader jurisdiction, and will open the written contract to let in an equity arising from facts perfectly distinct from the sense and construction of the instrument itself. I have looked into most if not all the cases on this branch of equity jurisdiction, and it appears to me to be established on great and essential grounds of justice, that relief can be had against any deed or contract in writing, founded in mistake or fraud. The mistake may be shown by parol proof, and the relief granted to the injured party, whether he sets up the mistake affirmatively by bill, or as a defense."

After reviewing many of the decisions on this question, the chancellor decides that parol proof was admissible, and that it established the mistake as charged in the bill.

It will be observed, the contract in this case was an executed contract, a deed of conveyance having been made ; there was no prayer for a specific performance of a contract, but to correct a mistake in the deed. The chancellor remarks, " Whether such proof be admissible on the part of a plaintiff, who seeks a specific performance of an agreement in writing, and at the same time seeks to vary it by parol proof, has been made a question. Lord Hardwicke, in *Jacques* v. *Statham*, 3 Atkins, 388, seemed to think it might be done, but such proof was rejected in *Woollam* v. *Hearn*, 7 Vesey, 211, (which we have cited at length) ; and in *Higginson* v. *Clowes*, 15 Vesey, 516 ; and when Lord Redesdale said, in *Clinan* v. *Cooke*, 1 Schoales and Lefroy, 39, that he could find no decision in which a plaintiff had been permitted to show an omission in a written agreement, by mistake or fraud, he must be understood to refer to the cases of bills for a specific performance of an agreement, which was the case then before him."

This case would seem to decide nothing more than this, that in a bill to correct a mistake in an executed contract, parol proof of the mistake is admissible, and that such proof is as

available for one party, or for one purpose, as for another—as available for the plaintiff in setting up a claim, as for the defendant in resisting it. It is nowhere said, that a bill to reform an executory contract, and then decree a specific performance when reformed, against a denial, in the answer, of any mistake, and the plea of the statute of frauds and perjuries, can be sustained by parol evidence.

This decision, so far as it goes, has been followed by the courts of many other States. The cases are referred to by Hare and Wallace, on pages 539, 540, but in none of them was the denial in the answer accompanied by a plea of the statute of frauds and perjuries. Nor do these cases go farther than to assert the genuine principle, that independent of this statute, where it is not set up as a defense, parol evidence will be received to correct an alleged mistake in a written executed contract, when asserted by a plaintiff, and is as available for him, as for a defendant.

The cases go to the extent of declaring, that parol evidence shall be admissible to correct a writing as well for a plaintiff as against him, thus establishing mutuality and equality in the operation of the doctrine.

In 1 Story's Eq. Juris., sec. 161, in commenting on the distinction set up, the learned author says, in a note, that it is of a very artificial character, and difficult to be reconciled with the general principles of courts of equity. He says, " the ground is very clear, that a court of equity ought not to enforce a contract, when there is a mistake, against the defendant insisting upon and establishing the mistake; for it would be inequitable and unconscientious. And if the mistake is vital to the contract, there is a like clear ground, why equity should interfere at the instance of the party as plaintiff, and cancel it; and if the mistake is partial only, why, at his instance, it should reform it. In these cases, the remedial practice is equal; and the parol evidence to establish it, is equally open to both parties to use as proof. Why should not the party aggrieved by a mistake in an agreement, have relief in all cases when he is plaintiff, as well as when he is defendant? If the doctrine be founded upon the impropriety of

admitting parol evidence to contradict a written agreement, that rule is not more broken in upon by the admission of it for the plaintiff than it is by the admission of it for the defendant. If the doctrine had been confined to cases arising under the statute of frauds, it would, if not more intelligible, at least have been less inconvenient in practice."

In a subsequent case, *Keisselbrack* v. *Livingston*, 4 Johns. Ch. R. 145, which was a bill for the specific performance of an agreement in writing to execute a lease for lives " containing the usual clauses, restrictions and reservations contained in the leases given by the defendant," the bill stated that a lease was offered, containing a provision that upon every sale of the demised premises, one-fifth of the purchase or consideration money should be taken by the defendant to his own use, which complainant refused to receive, alleging, that at the time of the execution of the writing, it was agreed no such quarter or fifth sales should be demanded or paid.

The defendant did not, in direct and clear terms, deny any such agreement, but denied any other or different contract than the one set forth made in writing, and as to the validity of the supposed verbal agreement, he pleaded the statute of frauds.

The point in the case was, whether this verbal agreement could be established by parol. The learned chancellor says, it did not appear to him, that the statute of frauds had any bearing on the case. " The agreement for the three life lease is in writing, and it has been partly performed, by possession taken and transferred, and rent paid. The right of the plaintiff rests upon the contract in writing, and the only inquiry is, whether there is not a mistake in the generality of the expression, that the lease was to contain the ' usual clauses,' etc., and whether the parties did not intend an exception in respect to the quarter sales. There is no doubt of their declared intention to make such an exception at the time the agreement was drawn ; and I am inclined to think that the writing is, and ought to be, susceptible of amendment and correction in that particular."

The proof was admitted, and the mistake corrected, partly

upon the ground, that the writing itself let in parol proof, to show which were "the usual clauses," etc., and such proof being let in by the contract itself, it might, on the principle of the agreement itself, be applied to correct any mistake manifestly shown to exist, in the general and unqualified terms of that part of the written agreement which depended for its explanation upon external proof.

This court has held, as a general proposition, that the terms of a written agreement cannot be changed by parol. *Baker* v. *Whiteside*, Breese (old ed.), 132 ; *Penny* v. *Graves*, 12 Ill. 298. And so it is held by all courts. At the same time, we have said, that whatever covenants an absolute deed may contain, parol evidence may be admitted to show that it was intended as a mortgage, or mere security for the payment of the debt, and the grantor can have relief in equity, and this, where mistake is not alleged. *Purviance et al.* v. *Holt*, 3 Gilm. 405; *Ferguson* v. *Sutphen*, id. 547. And it is also held, in *Harlow* v. *Boswell*, 15 Ill. 57, where parties commit their contracts to writing, this forms the only evidence of its terms.

In *Scott, Adm'r*, v. *Bennet*, 3 Gilm. 254, this court said, it is a familiar principle that you may give evidence to explain, but not to vary, add to, or alter a written contract. Courts cannot make a new contract for the parties. But if there is doubt and uncertainty, not about what the substance of the contract is, but as to its particular application, it may be explained, and properly directed.

As a general principle, where a contract is reduced to writing, the writing affords the only evidence of the terms and conditions of the contract ; all antecedent and contemporaneous verbal agreements are merged in the written contract.

There is an apparent contradiction in these several opinions, but we think a few familiar considerations will serve to reconcile them, or show that it is not real. The subjects peculiarly proper for the jurisdiction of courts of equity, are well understood to be, fraud, trusts, accident and mistake, and these courts are vested with the power to afford relief in all cases, wherein, by reason of the universality and rigor of the rules

of the common law, a remedy cannot otherwise be had. The power to correct a mistake in a writing, is as much within the scope of this jurisdiction, as any other mistake. The whole realm of mistake is laid open to the court, and its powers are limitless to correct, on a proper case made. That it should be dormant, when invoked to correct a mistake in a written contract, would be strange indeed. It is no answer to say, that within the rigid rule of law, the power may be exercised, but not outside of it, as that would destroy the rule. In our judgment, it has no such effect. The jurisdiction of a court of chancery to correct mistakes, is no less important to the due administration of justice, and the safety of the citizen, than the rule of the common law, that parol evidence cannot be received to add to, or vary a written contract, and in a court of equity, it must be determined, on the circumstances of each case, which shall prevail, the exercise of an unquestioned power of the court, or the rule of the common law.

The doctrine is undisputed and incontestable, that a deed, absolute on its face, may be shown, by parol, to have been intended by the parties to it, as conditional merely, and a court of equity, on proper proof, will so hold. This contract is explained by parol evidence, and if it is made to speak a language its words do not import, who will deny that it is within the competency of that court to ascertain the real contract of the parties, and then enforce it, according to the intention of the parties? If a court of equity has not the power to correct mistakes in a deed, or other writing, on convincing proof of the existence of the alleged mistake, great injustice would be perpetrated with impunity. A man sells a vacant lot adjoining the lot on which he has a costly residence, but by the mistake of the scrivenor, the deed describes the lot of his residence. An ejectment is brought— the purchaser claiming under his deed—and if no power exists in a court of equity to correct the mistake, he must surrender that which he never sold, and the purchaser recover a property he never bought. A court of chancery should not hesitate to receive parol evidence of this mistake, and on

sufficient proof, correct it, else the most flagrant injustice would be perpetrated, and an undoubted power of that court be rendered ineffectual and worthless. There can be no danger in exercising this power, since the court has before it all the facts, and if they are not convincing, the stern rule of law will prevail.

This court has, in many cases, acknowledged and exercised this power, and we do not know that it has been questioned by the bar here or elsewhere.

The doctrine is fully recognized in the case of *Broadwell* v. *Broadwell*, 1 Gilm. 599, that a court of chancery will always correct any mistakes of fact which have occurred in drawing up a paper, when a proper case is presented and clearly proved, and then carry into effect the instrument when thus corrected. And herein is found the safeguard for those so litigating, a proper case must be presented and clearly proved. If it be clearly proved, who shall say that a court of equity transcends its powers, or violates the rule of law, in declaring the contract to be as the parties have made it ? We cannot think the statute of frauds and perjuries has any application to such cases.

Here, the bill is filed to reform this contract, by inserting in it several tracts of land, alleged to have been omitted from it by mistake, and parol evidence is relied on for such purpose ; and when reformed, then the prayer is, to decree a specific performance of the contract. This proof makes the contract different from what its words import, and adds to it, and varies it very materially. It, in fact, makes a new and different contract ; yet if the mistake is clearly established, which should give way, that rigid rule of the common law, or that power residing in a court of equity, to correct mistakes ? The strongest and most convincing evidence will be required, before the common law rule is postponed, and the power of the court exercised. Now, what is the testimony in this case ?

It consists, in great part, of loose conversations held by one Gillespie, and others, with the intestate, in which he said, there was a mistake in the bond ; that the tract lying southeast of Shoal creek, being part of the west half of the north-

west of twenty-three was not in the bond, or not in right, and the Bilyeus had found it out. This witness states nothing in positive terms, but "thinks" the facts were so and so, as he details them. He "thinks" all the lands claimed by complainants were included in the bond, except the Gillespie tract, and thinks that intestate told him some of the numbers were wrong, and some of the land was not named in the bond. He spoke of the west half of the north-west twenty-three lying south-east of Shoal creek, as not included in the bond, and that he would not rectify the mistake because they could not agree upon a division of the lands according to his understanding of the contract. This witness says that he can neither read nor write, and details only such parts of the conversation, as he "thinks" was had with the intestate. He does not say in positive terms, that the intestate admitted to him he had sold this tract to complainants, or that it was left out of the bond by mistake. No testimony could be more unsatisfactory than his, taking the whole of it together. Fenton says he "thinks" Hunter told him he drew the bond himself, and that there was a mistake in it, but does not recollect what the mistake was. He says it was his understanding a bond was given by Hunter to complainants, and notes given for the payment of the money—does not say he ever saw the bond or notes—says the complainants never took possession of the Gillespie tract—on the tract south-east of the creek, they cut some timber off, put a blacksmith shop upon, and pastured the field on it while they and Hunter were in partnership; there was some money paid on the general contract, but don't know how much.

Paine states that Hunter told him complainants were to have half of this tract, when he, Hunter, sold or left, according to the contract as made with complainants, in the sale of the mill, which was in 1850. He had this conversation in the winter after the sale of the mill property; that complainants have cut and hauled saw logs, and Hunter and complainants built a blacksmith shop on this land; and "thinks" complainants repaired the fences some, but is not certain, and they used it as a pasture in connection with Hunter. Hunter also

said he had sold the Gillespie tract to them, and that David Hunter was to make a deed to it. Don't know that complainants ever exercised any acts of ownership over this tract. Hunter said there was a mistake in the bond, and if his health would permit, he was coming to town to get it fixed; "thinks" the mistake applied to the tract south-east of Shoal creek, on which there was an old field. Does not know of complainants exercising any acts of ownership over this "old field tract," since they and Hunter dissolved partnership; don't know the numbers of the land.

The testimony of Clouse, and of L. G. Bilyeu, does not differ, substantially, from that of other witnesses.

Smith says, Hunter told him, that all the lands the complainants were to get, were included in the bonds; that half of the timber on the tract lying on the south-east side of Shoal creek, on which there was an old field, was included in the contract with complainants, and that they had got their share off, and that he had not sold the land to them. Wesley Bilyeu had stated to witness that he had an interest in this tract, and Hunter then told him as above stated. Hunter had possession of this tract when witness bought it, and had corn standing in the field on it. George Smith stated that Hunter told him that complainants had no right to the tract lying south-east of Shoal creek, but as soon as he could buy a piece from John Clouse, he would make it right, but they were to have it when he sold or left; understood this same tract was included in the original contract.

This is the substance of the evidence to prove the mistake in the bond, and part performance, which, it is very clear, is wholly insufficient for either purpose. It would be relaxing too much those salutary rules of evidence, which require a contract to be clearly proved, before a specific performance of it will be decreed. It is discretionary with the court, in all such cases, to decree or not a specific performance of a contract, and that discretion will not be exercised except in a very clear case.

This contract was made in March, 1850, and the intestate remained in the State until 1851, during a part of which time

he was in partnership with complainants, in using the mill property. They paid their notes as they became due, and not a word of complaint is heard of any mistake. They were impleaded, by the administrator of the intestate, in a petition in chancery, for the purpose of obtaining an order of court, authorizing him to make a deed to them in performance of the covenant; in which suit, it was fully competent for the complainants to have litigated all these matters, but which they neglected to do. Though these proceedings are not pleaded, or set up in bar by the defendants, they might have been, successfully, and the case thus disposed of, rendering unnecessary the examination we have been compelled to give it on the issues made.

We are satisfied nothing has been shown to establish a mistake, its nature, or extent, so clearly, as to leave no doubt on the mind of the actual existence of the alleged mistake. The decree, as to the old field tract, being a part of the west half of the north-west quarter of section twenty-three, lying north-east of Shoal creek, and as to the Gillespie tract, is reversed, and the decree so modified as to exempt those tracts from its operation. The injunction will be dissolved, and the administrator, the appellant here, will be allowed to proceed with his action at law.

*Decree modified.*