## Charles G. Smith, et al., v. Frank F. Rust.

### Gen. No. 11,132.

1. PAROL EVIDENCE—*incompetency of, to affect written instrument.* It is a familiar rule of the common law that a written instrument contains the final agreement of the parties and that all prior propositions, discussions and differences are merged therein, and therefore parol evidence will not be received to falsify, vary or add to it.

2. FRAUD, ACCIDENT OR MISTAKE—*power of equity to relieve against.* It is universally conceded that a court of equity has power to afford relief where a written instrument is impaired by fraud, accident or mistake, and this power is of equal importance with the rule of the common law which prevents the affecting of a written instrument by parol evidence, and which rule should yield and which be enforced, is to be determined by the facts of each particular case.

3. FRAUD, ACCIDENT OR MISTAKE—*what essential to grant relief against.* Relief will not be granted against a written instrument and a new and different contract imposed upon the parties unless the

fraud, accident or mistake is established by evidence strong and convincing; a mere preponderance is not sufficient.

4. FRAUD, ACCIDENT OR MISTAKE—*what does not constitute.* Where one, knowing the terms thereof, enters into a sealed obligation, trusting to the verbal promise of the other party thereto that he should not be held responsible to the full extent of the obligation thus assumed, he cannot thereafter urge such verbal promise in a court of law as a defense to any portion of such obligation, nor can he successfully interpose the same in a court of equity as constituting fraud, accident or mistake.

Proceeding to enjoin collection of judgment. Appeal from the Circuit Court of Cook County; the Hon. EDWARD F. DUNNE, Judge, presiding. Heard in this court at the March term, 1903. Reversed and remanded. Opinion filed February 8, 1904.

HUGH L. BURNHAM and ARTHUR W. BURNHAM, for appellants..

COLSON & JOHNSON, for appellee.

MR. JUSTICE BALL delivered the opinion of the court. ·

Appellant Smith by written lease demised a certain store room and basement to Rust and one Batterman for the term of one year from May 1, 1899, for the sum of $1,200, payable in monthly installments of $100 each. The lease contained a warrant of attorney to confess judgment for any rent due and unpaid. The lessees entered into possession and paid a part of the stipulated rent. January 29, 1903, Smith recovered a judgment by confession under the warrant of attorney against Rust for $304.50 for the remainder of the rent due and unpaid, and had execution issued thereon. Rust then filed a bill to vacate such judgment and to enjoin its collection, upon the ground that the real contract between the parties was that Smith rented one-half of such store and basement to Rust for said term for the sum of $600, and the other half thereof to Batterman for the same price; that when the joint lease was presented for signature Rust called attention to its form; that Smith replied the form was a mistake; that if he and Batterman would sign the lease as it then was, he, Smith, would hold each of them for one-half of the rent

only; and that, relying upon this representation, they executed the lease and occupied the premises for the term. It was further alleged that Rust paid Smith the full $600, and at the time of the entry of the judgment owed him nothing. In other particulars the bill seems to be in proper form.

The answer explicitly denied the alleged agreement, and each and every subsequent admission and act set forth in the bill.

Upon the hearing the chancellor found the facts as stated in the bill, and entered a decree setting aside the judgment and enjoining its collection from Rust. Appellants bring the case to this court by appeal.

Rust testifies that in March, 1899, Smith agreed to rent him one-half the store and basement for $600 in installments of $50 per month; that when the lease was handed him witness said he would not sign it; that Smith replied the agent had made a mistake, and witness should pay one-half only of the rent and Batterman the other half, "you can take my word," and witness depended on that statement; that the receipts were always made out for the whole monthly rent, and if witness paid $50 only that was credited on the receipt; that for each of the first two months Batterman handed $50 to witness, and the latter gave his check for the full rent; that for the next two months witness paid $50 per month, and thereafter until the end of the lease he paid $75 monthly; that at the end of the term witness personally took a new lease of the entire premises at the same rent; that in August, 1900, Smith came to him and said he had $300 coming from Batterman, he was short $300 on the lease for half the store; that Batterman was called in, when Smith said to him, "You owe me $300 on that lease; Rust does not owe me anything; will you pay it?" that Batterman said he was short of money, and it was thereupon agreed that if Batterman would pay $170 at the rate of $10 per month, Smith would consider the account settled, and Batterman then paid $10 under this agreement. On cross-examination Rust said that he always

paid the rent to Mr. Thatcher, as agent; that the first two months when Batterman gave him $50, he did not tell him to pay his own rent, but took it and made out his own check for $100; that when he paid but $50 in July and August, the agent demanded $50 more, and said the receipt was for $100; that at the end of the first two months Batterman went out, one-half the store was vacant for two months, and then it was rented by witness with the consent of the agent for $25 per month. Q. "Did he (the agent, Thatcher) come to you after May 1, 1900, and make a demand on you for rent? A. For what rent? Q. For rent due Mr. Smith on that lease. The Court: For the rent that you claim Mr. Batterman owes. A. I cannot answer to that. I cannot say yes or no. I don't know. Q. Didn't he ever tell you that you owed the balance of the rent and he expected you to pay it? A. This young man? Q. Didn't he ever tell you that you owed a balance and he expected you to pay it? A. That I owed it? Q. Didn't he ever tell you that? The Court: Didn't Mr. Thatcher, that young man, say to you after the first of May, 1900, 'Well, now here. You owe that rent as well as Batterman, and I want it from you?' A. I cannot answer that question." Witness thinks the agent did ask him for entire rent, and he told agent to go to Batterman. The receipts were made out to Rust and Batterman, and the receipts the agent gave him were on account.

Batterman testified that in March, 1899, he had a conversation with Smith in reference to rent of one-half the premises. Rust was present. Smith said "Each of you want half the store;" said he could fix it. "So we go over there and make out a lease. My rent was to be $50 a month, $600 a year, one year lease, and he says I was to pay $50 and Rust was to pay $50." Witness remained in possession but two months. In August, Smith sent for him and said "You owe some money," and witness replied that he did and could pay a little every month. Smith said he would take $170 in full payment. Witness gave him a check for $10, and afterwards paid $10 more. Smith said

Rust didn't owe him a cent.  Cross-examination: When
the lease was presented Rust said it was not made out right,
and Smith replied "it was a mistake, and they would fix it
up.   That is the only thing I ever did hear of it."   In the
conversation in August, Smith said he did not want to hold
Rust, and Rust had paid his rent, and he looked to witness
for the other half.   Since that time witness has gone into
bankruptcy.

John Bunge, an employee of Rust, testified that he was
present at the conversation in August, 1900.   Mr. Smith
asked Mr. Rust "for a little more—how about the back
rent that was due on the store there."   Rust replied that
he had rented only one-half the store and had paid his rent
in full.   Smith rejoined that that was so, and he, Rust,
ought to have been released long ago; Batterman was the
one he ought to look to for the balance of the rent.   Then
Batterman came in and Smith said to him, "You owe me
$300 for back rent, and if you can't pay that I'll let you
off for $170, payable $10 per month."   Batterman then
gave Smith a check, the amount of which the witness did
not know.

The deposition of Smith was read.   In it he denied that
prior to the execution of the lease he made any arrange-
ment with Rust or with any one in his behalf in regard
to his, Rust, renting one-half of the premises for $600 per
year, or $50 per month, or upon any other consideration;
nor did Batterman make any arrangement for the renting
of the other half of the premises; nor did he have any con-
versation whatever with Batterman upon that subject; that
Rust never said to him that there was a mistake in the
lease, nor did witness say to Rust there was any mistake in
it, or that if Rust would sign the lease as it was, witness
would only hold him for one-half the rent; that witness
was present before and at the time the lease was signed;
and that nothing of the kind set up in the bill there occurred
or was said; that Rust executed the lease and went into
possession of the premises; and that the rent was not col-
lected by witness, but by his agents; that when he called

on Rust in August, 1900, for the remainder of the rent, Rust insisted that Batterman should pay it, and to avoid trouble witness said he would try to collect it from the latter, but did not tell Rust that he would release him in any way from his obligations under the lease. Thereupon Rust sent for Batterman. When the latter came witness told him he owed witness $300, and he admitted it; but witness did not state then or at any time to any one that Rust had fully paid his indebtedness, or that he had no claim against him under the lease; that witness did agree that if Batterman would promptly pay $10 per month until he had paid $170, witness would receipt in full to both tenants, but witness always maintained that the indebtedness was joint and several upon the part of both; that Batterman paid $30 only, and there was yet due at the time of the entry of the judgment $270.

A. C. Thatcher was the agent to collect this rent. He testifies that he went to Rust for the May and June, 1899, rent, and each time received Rust's check for $100. After that time the payments were either $50 or $80. The form of the receipt given was " Received of Rust & Batterman, so much, either on account, or balance, for any certain month, for the premises;" that he had three different conversations with Rust about the unpaid rent, advised him to get somebody to take a portion of the store, told him witness was accepting his payments of $50 merely on account; "that we looked to him for the whole rent; he said he understood that, and was doing his best to find some one;" that when witness told Rust they would look to him for the whole rent, he did not say that he paid all the rent he owed; " he acknowledged that he owed the rent;" that the receipts always stated the month on account of which they were given to make a continuous history of the rent; " I never gave a receipt except to Rust and Batterman."

Charles S. Quinlan, who was present when the lease was signed, and whose firm prepared that document, says he does not recollect the conversation, but " as far as I know there was no objection made to the lease in my presence."

It is a familiar principle of the common law that the written instrument contains the final agreement of the parties, and that all prior propositions, discussions and differences are merged in it, and therefore parol evidence will not be received to falsify it or to vary it or to add to it. It is also universally conceded that a court of equity has the power to afford relief where the written instrument is impaired by fraud, accident or mistake. The rule of the common law and the power of a court of chancery are of equal importance to the protection of the citizen and to the due administration of justice. Which should be enforced and which should give way is to be determined by the facts of each case, when it comes up for adjudication.

It is reasonable, and it is also the rule, that such an instrument will not be changed, and thereby a new and a different contract be imposed upon the parties, unless the fraud, accident or mistake be established by strong and convincing evidence. A mere preponderance in favor of the complaining party is not sufficient to set aside the common law rule. Unless the testimony establishes the alleged facts so clearly as to leave no doubt in the mind of the court as to their actual existence, the written instrument will not be set aside. The foregoing propositions are so elementary that they do not need to be supported by the citation of authorities. They have been stated by our Supreme Court many times. Hunter v. Bilyeu, 30 Ill. 228; Schwass v. Hershey, 125 Ill. 660.

We have set forth the evidence in this case at large. The testimony concerning the interview in August, 1900, has no value other than as it may tend to show what the original contract between the parties was, or as aiding in a proper interpretation of that contract. By signing the joint and several lease, and by entering into possession under it, Rust took upon himself the burden of showing that it does not truly describe the contract to which he is a party. His version as to what occurred at the time the lease was executed is supported, in part, by Batterman and by Bunge, and is positively denied by Smith, and is infer-

Smith v. Rust.

entially denied by Quinlan, and is discredited by the evidence of Thatcher. For two months, and so long as Batterman stayed in the premises, Rust paid the full rent with his own check, and accepted receipts running to both tenants. He will not say that Thatcher, the collector, did not come to him after the lease had expired and demand from him the balance of the rent; while Thatcher says he made such a demand three several times, and at no one of them did Rust say he had paid his rent in full, but, on the contrary, acknowledged that he owed it. All the evidence considered, we are of the opinion that Rust has not clearly and satisfactorily established his contention that the lease does not fully and truly express the intention of the parties; and we must therefore reverse and remand this case.

The writer thinks that no matter what view is taken of this evidence, Rust can have no relief for the reason that he does not bring himself within the equitable rule stated, and upon which he relies. His version is that Smith agreed to rent to him, Rust, one-half the premises for $600 and the other half thereof to Batterman for the same price; that when the lease was presented Rust saw that it was a joint lease by which each tenant became bound for the whole rent of $1,200, and thereupon he called the attention of Smith to this mistake in the drawing of the lease; that Smith replied the agent had made a mistake in form, but that if Rust and Batterman would sign it as it was, he, Smith, would hold each of them for one-half the rent only and that relying upon this promise Rust signed the lease and the tenants went into possession of the premises.

Here is neither fraud, accident nor mistake, at least one of which must be clearly shown to exist before a court of equity will interfere to reform the writing. Rust, before he executed the lease, knew its form and the legal effect of that form upon him if he joined in its making. Yet knowing these things he voluntarily entered into this sealed obligation, trusting to the promise of Smith that he, Rust, should not be held for more than one-half of the stipulated rent. Under these circumstances the promise is not a bar·

to an action at law for the unpaid rent, nor can it be the foundation of a bill in chancery to set aside a judgment entered upon the lease.

In Martin v. Hamlin, 18 Mich. 353, complainant entered into a verbal agreement with defendant to purchase of him a farm, well known to both, which had not been surveyed. The defendant said he would warrant that the farm contained 110 acres, that complainant should have it surveyed, and the amount of the deficiency, if any, should be endorsed upon a mortgage given as part of the purchase price. The survey showed that the farm contained but ninety-three and one-half acres. The defendant refused to allow that deficiency to be endorsed upon the mortgage. A bill was filed to compel the performance of the promise. The court held, by *Christiancy*, J., that the verbal agreement was merged in the deed, which instrument, in the absence of fraud, must be presumed to contain all the terms finally agreed upon; that the omission to insert the promise in the deed was not the result of any mistake of fact, or of inadvertence from the subject not occurring to the mind of the complainant; that a mistake in law as to the legal effect of the deed, if any such mistake there was, is no ground for relief; that under the facts parol evidence to contradict or vary the notes and mortgage could not be received, and that this rule applies as well in equity as at law; that the parties dealt with each other upon equal terms, there was no mistake in the execution of the papers they intended to execute, and possession was taken with full knowledge of the contents of all the papers and the question of deficiency present to the mind of complainant, without his asking that the promise concerning such deficiency be put in writing, and therefore the court held that it must be conclusively presumed that the whole contract of the parties was embraced in the papers executed.

In Sanford v. Gates, 21 Mont. 277, G. purchased the interest of R. in certain furniture and agreed to pay S. a balance due from R. to S. on such furniture. That amount was $449.06, but R. and S. told G. it was $649.06. Suspecting that their statement was not true, G. so stated

Smith v. Rust.

before he signed the contract, but upon the assurance of S. that if anything was wrong it should be fixed up, he executed the contract. G. paid $449.06 and then refused to make any further payment. S. brought replevin. G., in his answer to that suit (the court possessing chancery power over the relief sought), set up this promise. The court says: "Where there is no fraud or mistake in the preparation of the instrument, and it appears that the party signing understood its language and purport, it cannot be reformed on the ground that he signed upon the faith of the contemporaneous oral promise which was not kept, nor may such promise be received in evidence to control the written contract. In equity, as at law, the written contract merges all prior and contemporaneous negotiations and promises made by word of mouth in reference to the subject of the instrument. The presumption is conclusive that the whole agreement is embraced in the writing, and, while in equity a written contract may be cancelled or reformed for fraud or mistake, it may not be cancelled on the ground that the oral promise has not been kept, nor reformed on the ground that such promise was made, unless it be shown that its omission therefrom was by mistake, fraud or accident. It was not contemplated or intended by either party that the oral promise of plaintiff should be inserted in the contract. Defendant perhaps relied upon that ground. If so, his duty was to reduce the oral undertaking or promise to writing."

To the same effect are Dunham v. City of New Britain, 55 Conn. 378; Clark v. Hart, 57 Ala. 390; Wilson v. Deen, 74 N. Y. 531; and 20 Am. & Eng. Ency. (2nd Ed.), 809, and cases cited.

If we adopt the theory of Rust as to the facts herein, this established rule of the law seems to work individual hardship. Notwithstanding this, it is our duty to apply the rule to every case coming before us which plainly falls within its provisions.

The decree of the Circuit Court is reversed and the cause is remanded.

*Reversed and remanded.*